1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   FREDDIE CARL SPRINKLE,

11              Petitioner,              No. CIV S-05-1783 MCE DAD P

12        vs.

13   THOMAS L. CAREY,

14              Respondent.           <u>FINDINGS AND RECOMMENDATIONS</u>

15   _____/

16            Petitioner is a state prisoner proceeding through counsel with an application for

17   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges former Governor

18   Davis' reversal of the 2002 decision by the California Board of Parole Hearings (hereinafter

19   "Board") granting petitioner parole.  In addition, petitioner challenges the Board's subsequent

20   decisions in 2003 and 2004 finding him unsuitable for parole.  Before the court is petitioner's

21   motion for partial summary judgment in which he argues that the record contains no evidence

22   supporting either Governor Davis' reversal or the Board's subsequent decisions.  Respondent has

23   filed an opposition.  Petitioner has filed a reply.

24                          **PROCEDURAL BACKGROUND**

25            Pursuant to a negotiated disposition, petitioner entered a plea of guilty to second-

26   degree murder and was sentenced on August 29, 1987, in the Lassen County Superior Court to

fifteen years to life in state prison.[1]  (Pet. Ex. A.)  Petitioner entered the California Department of

Corrections and Rehabilitation on September 1, 1987, to begin serving his term and became

eligible for release on parole on December 16, 1996.  (Pet'r's Mot. for Summ. J. at 5.)

The circumstances of petitioner's offense of conviction are essentially as follows.

In 1986, petitioner's wife had separated from him.[2]  Petitioner saw his wife's truck parked on the

roadside, drove up next to it to speak with her and discovered that she was with the victim, Don

Pilger, who had previously stayed at the couples' home.  Petitioner pointed a gun at Pilger and

ordered him to get out of the car.  The events that immediately followed were unclear but, as a

result, petitioner shot Pilger in the head and killed him.  Petitioner left the scene with his wife

and his passenger.  They drove towards Reno where petitioner eventually dropped off his wife

and his passenger and turned himself in at a Reno police station.  (Id.)

In 2002, the Board unanimously found petitioner suitable parole.  (Pet. at 12-13.)

That same year, however, then-Governor Davis reversed the Board's decision.  (Pet. at 13.)  The

Governor reasoned that petitioner demonstrated a wanton disregard for human suffering and

caused great bodily injury.  (Id. at 14.)  In addition, the Governor explained that petitioner had

been involved in a previous assault involving a firearm, anger and alcohol, in which he struck out

at his girlfriend's father and fired a gun at her uncle.  (Id.)  Finally, the Governor expressed

concern regarding petitioner's substance abuse, his continued assertion that the shooting which

led to his conviction was accidental, and his ability to control his anger.  (Id. at 14-15.)

In 2003 and 2004, the Board held parole hearings and found petitioner unsuitable

for parole.  (Pet'r's Mot. for Summ. J. at 11-12.)  In 2003, the Board reasoned that petitioner

---

[1]  Petitioner alleges that at his trial the jury acquitted him of the first-degree murder charge and failed to reach a verdict on the lesser included offense of second-degree murder as well as on all other counts against him.  (Pet. at 2.)  Thereafter, he negotiated the plea that was eventually entered.

[2]  Petitioner claims that the separation was unexpected and caused him to fall into an "emotional and physical nose-dive" in which he drank, used drugs and did not sleep.  (Pet'r's Mot. for Summ. J. at 5.)

1   carried out his offense in a rather uncaring and unfeeling manner and that his motive in

2   committing the crime was inexplicable or very trivial in relationship to the offense.  (Id.)  In

3   addition, the Board cited petitioner's previous assault involving a gun.  (Id.)  In 2004, the Board

4   similarly reasoned that petitioner carried out his offense in an especially cruel and callous manner

5   and his motive was inexplicable or very trivial.  (Id. at 14.)  In addition, the Board found that

6   petitioner's offense involved multiple victims because his estranged wife was present when he

7   shot Mr. Pilger.  (Id.)

8          On June 4, 2003, petitioner filed a habeas petition in the San Joaquin County

9   Superior Court, challenging the Governor's reversal of the Board's 2002 parole grant on due

10   process grounds.  (Pet. at 3.)  The court denied the petition, holding that there was "some"

11   evidence  supporting the Governor's decision.  (Id., Attach.)  The Superior Court cited the same

12   reasons relied on by the Governor, including petitioner's wanton disregard for human suffering

13   and the previous incident involving a gun.  (Id.)  Petitioner then sought habeas relief from the

14   California Court of Appeal for the Third Appellate District.  That court summarily denied his

15   petition.  (Id. at 3 & Attach.)

16          On February 24, 2003, petitioner filed a habeas petition with the California

17   Supreme Court, challenging on due process grounds both the Governor's reversal of the Board's

18   2002 decision granting parole and the Board's 2003 decision denying him parole.  (Pet. at 4.)  On

19   October 18, 2004, petitioner filed another  habeas petition in the California Supreme Court,

20   challenging the Board's 2004 decision denying him parole as violating due process.  (Id.)  On

21   July 20, 2005, the California Supreme Court summarily denied petitioner's challenges to all three

22   parole denials.  (Id. at 3-4; Resp't's Opp'n to Pet'r's Mot. for Summ. J., Ex. G.)

23          On September 7, 2005, petitioner filed the instant federal petition for writ of

24   habeas corpus.  On September 5, 2006, this court denied respondent's second amended motion to

25   dismiss and ordered respondent to file a new response to the habeas petition.  On November 2,

26   2006, respondent filed an answer.  On December 4, 2006, petitioner filed a traverse.  On March

15, 2007, petitioner filed a motion for partial summary judgment, arguing that the record contains

no evidence supporting the Governor's 2002 reversal of the Board's decision granting him parole

nor does any evidence support the Board's subsequent denials of parole in 2003 and 2004.  On

April 20, 2007, respondent filed an opposition to the motion.  On April 30, 2007, petitioner filed

a reply.  On March 4, 2007, the undersigned heard oral arguments from the parties and took the

matter under submission.

## SUMMARY JUDGMENT APPLICABILITY

The Rules Governing Section 2254 Cases in the United States District Courts

establish that "[t]he Federal Rules of Civil Procedure, to the extent that they are not inconsistent

with these rules, <u>may be applied, when appropriate</u>, to petitions filed under these rules."  Rule 11,

Rules Governing § 2254 Cases (emphasis added).  Thus, summary judgment motions have been

found appropriate in habeas corpus proceedings.  <u>Blackledge v. Allison</u>, 431 U.S. 63, 80 (1977);

<u>Clark v. Johnson</u>, 202 F.3d 760, 764-65 (5th Cir. 2000) ("As a general principle, Rule 56 of the

Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the

context of habeas corpus cases.").  The court is not bound in habeas proceedings, however, to

"systematically apply traditional rules governing civil proceedings when to do so would be

inconsistent with the overriding purpose of the federal habeas corpus statute."  <u>Brown v.</u>

<u>Vasquez</u>, 952 F.2d 1164, 1169 (9th Cir. 1991).  Nonetheless, the court finds this action

appropriate for resolution by way of motion for summary judgment.  The facts are not in dispute,

there is no request or need for discovery and the underlying petition is fully briefed and stands

submitted for decision.

## SUMMARY JUDGMENT STANDARDS

Normally in civil cases, summary judgment is appropriate when it is demonstrated

that there exists "no genuine issue as to any material fact and that the moving party is entitled to

a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

/////

1
2
3
4

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

5   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[A]

6   complete failure of proof concerning an essential element of the nonmoving party's case

7   necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

8   should be granted, "so long as whatever is before the district court demonstrates that the standard

9   for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

10          If the moving party meets its initial responsibility, the burden then shifts to the

11  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

12  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

13  establish the existence of this factual dispute, the opposing party may not rely upon the

14  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

15  form of affidavits and/or admissible discovery material, in support of its contention that the

16  dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

17  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

18  of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

19  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

20  1987).

21          Thus, summary judgment is appropriate in the typical civil case when it is

22  demonstrated that there exists no genuine issue as to any material fact, and that the moving party

23  is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see also Adickes v. S.H. Kress

24  & Co., 398 U.S. 144, 157 (1970); Owens v. Local No. 169, 971 F.2d 347, 355 (9th Cir. 1992).

25  /////

26  /////

# THE ARGUMENTS OF THE PARTIES

I. Petitioner's Motion

Petitioner argues that former Governor Davis' reversal of the Board's 2002 decision granting him parole, as well as the Board's subsequent decisions in 2003 and 2004 finding him unsuitable for parole, deprived him of his liberty without due process of law because none of the decisions were based on sufficient evidence. (Pet'r's Mot. for Summ. J. at 3.) Petitioner asserts that the record reviewed by the state courts is before this court and constitutes the undisputed facts upon which this court can decide the pending motion for partial summary judgment. (Id.) He argues that this court may grant his motion if it finds that the state court decisions denying him habeas relief were contrary to or involved an unreasonable application of clearly established federal law and/or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court proceedings. (Pet'r's Mot. for Summ. J. at 16.)

Petitioner argues that a governor may reverse a parole grant only if he "reasonably believes that the gravity of the commitment offense indicates a continuing danger to the public safety" and there is "some evidence" to support that decision. (Pet'r's Mot. for Summ. J. at 16-17.) Petitioner maintains in this regard that "the sole basis for denying parole to a life prisoner in California is if there is evidence that reasonably supports the conclusion that he *currently* presents an unreasonable risk of danger to the public if released." (Id. at 17.)  Specifically, petitioner argues that, under California law, an assessment of *present* dangerousness depends on post-offense developments. (Id.)

Petitioner contends that he was sentenced to fifteen years to life in prison, has served almost twenty-one years in prison and that twenty-two years have passed since he committed his offense. (Id.) He notes that the 2002 parole hearing marked his third such hearing and that he had served his minimum term of fifteen years in prison at the time of the former Governor's reversal of the Board's decision granting him parole. (Id.) Petitioner emphasizes

6

that, unlike the petitioner in <u>Irons v. Carey</u>, 505 F.3d 846, 853-54 (9th Cir. 2007), he had served his minimum term at the time of the Governor's reversal and had served more than his minimum term when the Board denied him parole in 2003 and 2004.  (<u>Id.</u> at 19.)  Petitioner contends he has also exhibited strong rehabilitation.  (<u>Id.</u> at 19-20.)  He argues that the state's conclusion that he presented an unreasonable risk of danger to the public if released in 2002, 2003 and 2004 lacks evidentiary support reasonably related to the conclusions reached.  (<u>Id.</u> at 22.)

Petitioner takes issue with respondent's argument that his commitment offense provides "some evidence" to support the parole denials because, petitioner explains, respondent never articulates how the commitment offense in this case supports the parole denials.  (<u>Id.</u> at 22-23.)  Petitioner contends that the only possible link between the commitment offense and his present suitability for parole are statements by the Board and the former Governor suggesting that he has minimized, or not fully accepted responsibility for, his offense and his substance abuse or that he has not adequately addressed his anger and stress management issues.  (Pet'r's Mot. for Summ. J. at 23.)  However, petitioner argues that there is absolutely no evidence that he minimizes his offense conduct simply because he maintains that he did not intend to kill Mr. Pilger.  (<u>Id.</u> at 23-24.)  In addition, petitioner notes that he has not had a single disciplinary or counseling reprimand while incarcerated and has participated in AA, NA, and Straight Life.  (<u>Id.</u> at 23.)  Finally, petitioner points out that reports and psychiatric evaluations state that he has in fact developed the ability to deal with anger and stress and conclude that he would pose little to no risk to the public if released on parole.  (<u>Id.</u>)

Petitioner emphasizes that the underlying facts of his offense of commitment are static, occurred almost twenty-two years ago and will never change.  (Pet'r's Mot. for Summ. J. at 25.)  Petitioner concludes that nothing about his crime suggests that he currently presents an exceptional danger if paroled.  (<u>Id.</u> at 26.)  Accordingly, petitioner requests that the court grant his motion for partial summary judgment and grant him habeas relief.  (<u>Id.</u> at 27.)

/////

1  II.  Respondent's Opposition

2          Respondent opposes petitioner's motion on both procedural and substantive

3  grounds.  First, respondent opposes the motion because petitioner failed to include a statement of

4  undisputed facts with his motion for summary judgment as required by Local Rule 56-260(a).

5  Respondent also complains about petitioner's attempt to expedite review of his habeas petition

6  by moving for partial summary judgment, noting that in the pending motion counsel for

7  petitioner has merely reiterated the arguments already contained in the previously filed petition

8  and traverse.  (Resp't's Opp'n to Pet'r's Mot. for Summ. J. at 2.)

9          Respondent also opposes the motion on the merits, arguing (1) petitioner's due

10 process rights have not been violated; (2) the state court properly found that the Board's decision

11 denying petitioner parole was supported by some evidence; (3) the state courts properly rejected

12 petitioner's argument that the Governor's reversal of the Board's parole decision constituted an

13 unlawful ex post facto application of the law; and (4) the Board's subsequent parole decisions

14 did not violate the Eighth Amendment's prohibition on cruel and unusual punishment.[3]  (Resp't's

15 Opp'n to Pet'r's Mot. for Summ. J. at 2.)

16         Respondent contends that this court should deny petitioner relief because the

17 California Supreme Court's summary denial of his habeas petition was a judgment on the merits

18 that was not contrary to, nor involved an unreasonable application of, clearly established federal

19 law.  (Resp't's Opp'n to Pet'r's Mot. for Summ. J. at 3.)  Respondent asserts that this state court

20 decision is entitled to deference and was not contrary to clearly established federal law with

21 respect to the protections due inmates in the parole process since the Board afford petitioner the

22 opportunity to be heard and advised him of the reasons for the unsuitability finding.  (Id. at 3-5.)

23

24         [3]  Rather than providing opposition to the arguments advanced in petitioner's motion for
   summary judgment, respondent has elected to file the same memorandum and points and
25 authorities that he filed with his answer to the petition.  Accordingly, respondent has
   unnecessarily addressed petitioner's ex post facto and Eighth Amendment claims which are not
26 raised by petitioner as grounds for granting summary judgment in his favor.

1  Respondent also argues that even if the denial of parole is required to meet the "some evidence"

2  test as petitioner claims, the decisions here meet that test.  (Id. at 5.)  Respondent points to the

3  determination of the San Joaquin County Superior Court in which that court explained:

4           [t]he Governor noted that this incident was not Petitioner's first
            incident involving guns, anger and alcohol.  The Governor added
5           that he remains concerned over Petitioner's ability to control his
            anger, citing Petitioner's 1997 exclusion from the Straight Life
6           program for being 'highly confrontational.'  Thus, there is 'some'
            evidence, which supports the Governor's decision.
7

8  (Id. at 6.)

9           Respondent next contends that petitioner's commitment offense, shooting an

10  innocent man in a jealous rage, constitutes "some evidence" supporting the Governor's decision

11  to deny him parole since there are elements present in petitioner's offense that go beyond the

12  minimum necessary to support his second degree murder conviction.  (Id.)  In particular,

13  respondent points to petitioner's trivial motive and asserts that multiple victims were harmed by

14  petitioner since his estranged wife witnessed the shooting.  (Id.)[4]

15  III.  Petitioner's Reply

16           Petitioner maintains that proceeding by way of summary judgment is appropriate

17  and that he has satisfied the requirements of the local rules.  He acknowledges that he filed this

18  motion to obtain a speedy adjudication of his claims but observes that the court's resolution of

19  his claim that the decisions denying him parole are not supported by "some evidence" will result

20  in his release and conserve both judicial and fiscal resources.  (Pet'r's Reply at 3.)

21  /////

22

23           [4]  As noted, respondent advances two arguments addressing claims included in the
    pending petition but upon which petitioner has not sought summary judgment.  (Resp't's Opp'n
24  to Pet'r's Mot. for Summ. J. at 6.)  First, respondent argues that the Board's decision to deny
    petitioner parole does not constitute an ex post facto application of law under the holding in
25  Johnson v. Gomez, 92 F.3d 964 (9th Cir. 1996).  (Id.)  Next, respondent argues that the denial of
    parole to petitioner does not violate the Eighth Amendment so long as his sentence does not
26  exceed the statutory maximum.  (Id.)  These arguments need not be addressed by the court.

Petitioner argues that respondent's due process arguments are completely misplaced. (Pet'r's Reply at 4.)  In this regard, petitioner contends, respondent has confused an inmate's procedural due process rights at a parole hearing with the standards applicable to judicial review of parole decisions. (Id. at 5.)  Here, petitioner contends that both state and federal law require that "some evidence" support a decision to deny a prisoner parole.  (Id.)

Petitioner also reiterates that the state's continued reliance on dated offense conduct even after a prisoner has served the minimum number of years required by his sentence and demonstrates longstanding rehabilitation, may violate due process.  (Id. at 7.)  Petitioner rebuffs respondent's argument that the decisions of the former Governor and the Board denying him parole properly relied upon a previous assaultive incident, the finding that he was confrontational while participating in the Straight Life Program while imprisoned, and the claim that the circumstances of his crime involved more than the minimum acts necessary to support his conviction for second-degree murder.  (Pet'r's Reply at 8.)  First, petitioner explains that the previous incident involving a gun referred to in the decisions occurred thirty-one years ago and that in the incident he was fired upon first.  (Id.)  Furthermore, petitioner argues it remains unclear whether he suffered any conviction stemming from this aged incident, but if he did, the most that was involved was a misdemeanor suspended sentence and that the matter was nowhere near the seriousness attributed to it by the state.  (Id.)  In addition, petitioner contends that his commitment offense did not involve "multiple victims" merely because it occurred in the presence of his estranged wife since there was no evidence that he pointed the gun at his wife or committed any offense against her at the time of the shooting .  (Id. at 9.)

As to his motive for committing the crime, petitioner claims that his case is like others in which a husband has acted irrationally in killing his wife's boyfriend in anger.  (Id. at 9-10.)  Counsel contends on petitioner's behalf that, under these circumstances, the motive for the offense cannot be fairly characterized as either inexplicable or trivial.  (Id.)  Finally, petitioner contends that the Governor's concern regarding petitioner's ability to control his anger based on

1   the cited incident during his participation in the Straight Life Program was not supported by

2   some evidence.  (Id. at 11.)  Petitioner points out that he was reinstated to the program shortly

3   after the incident, indicating that the decision to terminate him was ill-considered and that there

4   was a valid explanation for what had occurred.  (Id.)

5                                             **ANALYSIS**

6   I.  Standard of Review Applicable to Habeas Corpus Claims

7              A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

8   some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860,

9   861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v.

10  Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the

11  interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

12  Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas

13  corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377

14  (1972).

15             Under 28 U.S.C. § 2254, the court cannot grant a writ of habeas corpus unless the

16  state court's adjudication of petitioner's due process claim:

17             (1) resulted in a decision that was contrary to, or involved an
               unreasonable application of, clearly established federal law as
18             determined by the United States Supreme Court; or

19             (2) resulted in a decision that was based on an unreasonable
               determination of the facts in light of the evidence presented.
20

21  28 U.S.C. § 2254(d).

22             The court looks to the last reasoned state court decision as the basis for the state

23  court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state

24  court reaches a decision on the merits but provides no reasoning to support its conclusion, a

25  federal habeas court independently reviews the record to determine whether habeas corpus relief

26  is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003);

1   Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not

2   reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

3   AEDPA's deferential standard does not apply and a federal habeas court must review the claim

4   de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160,

5   1167 (9th Cir. 2002).

6           In this case, the California Court of Appeal and the California Supreme Court

7   summarily denied petitioner's habeas petitions challenging the 2002 reversal of the Board

8   decision granting him parole.  (Pet. at 3-4.)  Similarly, the California Supreme Court summarily

9   denied petitioner's habeas petition challenging the Board's subsequent 2003 and 2004 decisions

10  to deny him parole.  (Id. at 4-5.)  The orders issued by each of these courts is "an unexplained

11  order," i.e., "an order whose text or accompanying opinion does not disclose the reason for the

12  judgment."  Ylst v. Nunnemaker, 501 U.S. 797, 802 (1991).  When confronted with a state

13  court's unexplained order, the federal court applies the following presumption:  "Where there has

14  been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding

15  that judgment or rejecting the same claim rest upon the same ground."  Ylst, 501 U.S. at 803.  In

16  applying this look-through presumption, unexplained orders are given no effect.  Id. at 804.  See

17  also Bains v. Cambra, 204 F.3d 964, 970-71, 973-78 (9th Cir. 2000) (holding that where the

18  highest state court to reach the merits of a habeas petition issued a summary opinion that does not

19  explain the rationale of its decision, federal court review under § 2254(d) is of the last explained

20  state court opinion to reach the merits).

21          With respect to petitioner's challenge to the former Governor's 2002 reversal of

22  the Board's decision to grant parole, the San Joaquin County Superior Court issued the only

23  order setting forth reasons for denying habeas relief to petitioner.  In light of the Superior Court's

24  reasoned judgment, the court will look through the later unexplained California Court of Appeal

25  and California Supreme Court decisions to analyze whether the reasoned state judgment was

26  erroneous.  See Hayward v. Marshall, 512 F.3d 536, 541 (9th Cir. 2008).

12

1           With respect to petitioner's challenge to the subsequent denials of parole by the

2   Board in 2003 and 2004, the California Supreme Court summarily denied petitioner's only

3   habeas petitions challenging those decisions.  As such, the court will conduct an "independent

4   review of the record" to determine whether the state court's decision was objectively reasonable.

5   Himes, 336 F.3d at 853; Greene v. Lambert, 288 F.3d 1081, 1088-89 (9th Cir. 2002); Delgado,

6   223 F.3d at 981-82.

7   II.  Petitioner's 2002 Denial of Parole

8           A.  Former Governor Davis' Reversal of the Board's 2002 Decision

9           As noted above, in 2002 the Board granted petitioner parole but then-Governor

10  Davis reversed the Board's decision.  The Governor explained his rationale as follows:

> Mr. Sprinkle demonstrated a wanton disregard for human suffering and caused great bodily injury.  Mr.  Sprinkle not only confronted Mr. Pilger while holding a loaded firearm, he went so far as to cock the gun.  And Mr. Pilger was not his only victim. His act of violence caused trauma to Mrs. Sprinkle, who had to witness first hand, the death of her friend.

> This was not Mr. Sprinkle's first assault involving guns, anger and alcohol.  In 1976, he was arrested in Carson City, Nevada for felony coercion, kidnapping, battery with a deadly weapon, and assault with intent to commit murder.  According to Mr. Sprinkle, he was very drunk when he got into an argument with his girlfriend and her family.  He struck out at her father and fired a gun at her uncle.  In the 1990 psychological evaluation, Mr. Sprinkle claimed that the charges were reduced to a simple assault. Although there is no official record, Mr. Sprinkle claimed that he received a six-month sentence, which was stayed.

> I find it troubling that in his psychological evaluations, Mr. Sprinkle admits to using methamphetamine, cocaine and alcohol the day before his life crime, yet denies having a substance abuse problem.  In 1998, the Board of Prison Terms recommended that he get more Alcoholics Anonymous and Narcotics Anonymous programming so he could demonstrate a greater knowledge of the 12-step program at the next parole suitability hearing.  In 2000, the psychological evaluator noted that Mr. Sprinkle's "reentry to the free community must include abstinence from and monitoring of alcohol and drugs."  Yet, I question Mr. Sprinkle's sincerity in addressing his substance abuse problems.  At the 2002 parole suitability hearing, when asked why he attended Alcoholics Anonymous, he simply said, "the Board asked me to."  I believe

additional time should be spent in substance abuse programs to
ensure that Mr. Sprinkle understands fully the need to maintain an
alcohol and drug free lifestyle.

Mr. Sprinkle's continued assertion that the shooting was
accidental is also disconcerting.  He pled guilty to second-degree
murder not involuntary manslaughter.  In the last psychological
evaluation in 2000, the evaluator noted "there is an element of
denial and rationalization" in Mr. Sprinkle's life.  That denial has
persisted.  At the 2002 parole suitability hearing, Mr. Sprinkle
testified that picking up that gun, "wasn't a conscious act . . . I
don't even remember picking it up."  Equally disturbing is his
inability to provide consistent details about the discharge of the
gun.  I view this as a failure to accept responsibility for his actions,
which is an indication that he may still pose a risk to public safety
if released at this time.

I am greatly concerned about Mr. Sprinkle's ability to
control his anger given the impulsive nature of the life crime.  In
2001, the Board of Prison Terms found Mr. Sprinkle unsuitable for
parole because he "continues to be [an] unpredictable threat to
others."  Therapy was recommended to help him cope with stress
in a nondestructive manner.  As he testified at the 2002 hearing, he
grabbed for a gun because he was "overcome by anger."  Although
he recognized that anger was the cause for the shooting, I am
concerned that he has not had sufficient programming in anger
management to develop and maintain coping skills.  As recent as
1997, there was still some indication that he needed improvement.
He was excluded from participation in the Straight Life Program
for being "highly confrontational" with a guest.  I believe Mr.
Sprinkle would benefit from participation in anger management
programs to help him learn how to control his anger.

The Lassen County District Attorney's Office is opposed to
Mr. Sprinkle's parole.  In a letter dated February 27, 2002, the
District Attorney's Office stated, "we believe that Mr. Sprinkle
would still pose an unpredictable threat to society."

I believe Mr. Sprinkle would benefit from additional
incarceration and additional participation in substance abuse
programs, anger management programs, self-help programs, and
individual therapy.  Without additional time spent in these areas, I
believe Mr. Sprinkle continues to pose a significant risk of danger
to public safety if released at this time.  Accordingly, I REVERSE
the Board of Prison Terms' decision to parole Mr. Sprinkle.

(Resp't's Opp'n to Pet'r's Mot. for Summ. J., Ex. C.)

/////

/////

1        B.  State Court Review of Former-Governor Davis' Decision

2              As noted above, petitioner filed a state habeas petition in the San Joaquin County

3  Superior Court, challenging the Governor's reversal as a violation of due process.  The Superior

4  Court denied relief, explaining:

5              In In re Johnny Arafiles (1992) 6 C.A.4th 1467, the court
          concluded that the review authorized by section 8(b) and Penal
6          Code section 3041.2 is confined to a reexamination and
          consideration of the administrative record before the BPT . . . .  A
7          habeas proceeding is in the nature of a collateral attack and [an
          order] that is collaterally attacked carries with it a presumption of
8          regularity . . . . In the absence of such evidence, we must presume
          the Governor properly performed his review function within the
9          constitutional and statutory framework.  Ibid @ 1478.  (internal
          quotations omitted)

10

11              Title 15 of the California Code of Regulations, section 2402
          provides the guidelines for parole consideration.  Circumstances
          tending to show unsuitability are listed and include consideration of
12          the commitment offense and whether the crime was committed in a
          heinous or cruel manner and whether the motive for the crime was
13          trivial in relation to the offense.  The importance attached to any
          circumstance or combination of circumstances "is left to the
14          judgment of the panel" and in this case, the Governor.

15              The record reflects that the Governor reversed the parole
          decision citing the fact that Petitioner "demonstrated wanton
16          disregard for human suffering and caused great bodily injury."  The
          Governor noted that this incident was not Petitioner's first incident
17          involving guns, anger and alcohol.  The Governor added that he
          remains concerned over Petitioner's ability to control his anger
18          citing Petitioner's 1997 exclusion from the Straight Life program
          for being "highly confrontational."
19
              Thus, there is "some" evidence which supports the
20          Governor's decision.

21  (Resp't's Answer, Ex. O.)

22        C.  Federal Habeas Review of State Parole Decisions

23              The Due Process Clause of the Fourteenth Amendment prohibits state action that

24  deprives a person of life, liberty, or property without due process of law.  A person alleging due

25  process violations must first demonstrate that he or she was deprived of a liberty or property

26  interest protected by the Due Process Clause and then show that the procedures attendant upon

1    the deprivation were not constitutionally sufficient.  Kentucky Dep't of Corrections v.

2    Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir.

3    2002).

4              A protected liberty interest may arise from either the Due Process Clause of the

5    United States Constitution or state laws.  Board of Pardons v. Allen, 482 U.S. 369, 373 (1987).

6    The United States Constitution does not, of its own force, create a protected liberty interest in a

7    parole date even one that has been set.  Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).  However,

8    "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that parole

9    release will be granted' when or unless certain designated findings are made, and thereby gives

10   rise to a constitutional liberty interest."  McQuillion, 306 F.3d at 901 (quoting Greenholtz v.

11   Inmates of Nebraska Penal, 442 U.S. 1, 12 (1979)).  In this regard, it is clearly established that

12   California's parole scheme gives rise to a cognizable liberty interest in release on parole even for

13   prisoners who have not already been granted a parole date.  Hayward v. Marshall, 512 F.3d 536,

14   542 (9th Cir. 2008); Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006);

15   Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillion, 306 F.3d at 903.  Accordingly,

16   this court must examine whether the deprivation of petitioner's liberty interest in this case

17   violated due process.

18             Because "parole-related decisions are not part of the criminal prosecution, the full

19   panoply of rights due a defendant in such a proceeding is not constitutionally mandated."

20   Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987) (internal quotations and

21   citation omitted).  Where, as here, parole statutes give rise to a protected liberty interest, due

22   process is satisfied in the context of a hearing to set a parole date where a prisoner is afforded

23   notice of the hearing, an opportunity to be heard and, if parole is denied, a statement of the

24   reasons for the denial.  Id. at 1390 (quoting Greenholtz, 442 U.S. at 16).  See also Morrissey v.

25   Brewer, 408 U.S. 471, 481 (1972) (describing the procedural process due in cases involving

26   parole issues).  Violation of state mandated procedures will constitute a due process violation

1    only if the violation causes a fundamentally unfair result.  Estelle, 502 U.S. at 65.

2            In California, the setting of a parole date for a state prisoner is conditioned on a

3    finding of suitability.  Cal. Penal Code § 3041; Cal. Code Regs. tit. 15, §§ 2401 & 2402.  The

4    requirements of due process in the parole suitability setting are satisfied "if some evidence

5    supports the decision."  McQuillion, 306 F.3d at 904 (citing Superintendent v. Hill, 472 U.S.

6    445, 456 (1985)); Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994) (citing Perveler v. Estelle,

7    974 F.2d 1132, 1134 (9th Cir. 1992)).  It is this "some evidence" standard that lies at the heart of

8    petitioner's claims in this case and upon which he moves for summary judgment in his favor.

9    For purposes of AEDPA, Hill's "some evidence" standard is "clearly established" federal law.

10   See Hayward, 512 F.3d at 542; Irons, 505 F.3d at 851; Sass, 461 F.3d at 1129 (citing Hill, 472

11   U.S. at 456).  "The 'some evidence' standard is minimally stringent," and a decision will be

12   upheld if there is any evidence in the record that could support the conclusion reached by the

13   fact-finder.  Powell, 33 F.3d at 40 (citing Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987));

14   Toussaint v. McCarthy, 801 F.2d 1080, 1105 (9th Cir. 1986).  However, "the evidence

15   underlying the board's decision must have some indicia of reliability."  Jancsek, 833 F.2d at

16   1390.  See also Perveler, 974 F.2d at 1134.[5]  Determining whether the "some evidence" standard

17

---

18       [5] Under California law, the Governor must use the same factors as the Board when
     considering whether to reverse a grant of parole.  Hayward v. Marshall, 512 F.3d 536, 542 (9th
19   Cir. 2008).  Specifically, under California Penal Code § 3041(a), "a life prisoner shall be found
     unsuitable for parole if in the judgment of the panel the prisoner will pose an unreasonable risk
20   of danger to society if released from prison."  In reviewing this regulation, the Ninth Circuit has
     observed:
21
             "[t]he test is not whether some evidence supports the reasons the
22           Governor cites for denying parole, but whether some evidence
             indicates a parolee's release unreasonably endangers public safety.
23           Some evidence of the existence of a particular factor does not
             necessarily equate to some evidence the parolee's release
24           unreasonably endangers the public safety."

25   Hayward, 512 F.3d at 543 (quoting In re Lee, 143 Cal. App. 4th 1400, 1408 (2006)).  See also
     Jancsek v. Or. Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987) (due process is satisfied if
26   some evidence supports the decision).

1    is satisfied does not require examination of the entire record, independent assessment of the

2    credibility of witnesses, or the weighing of evidence.  Toussaint, 801 F.2d at 1105.  The question

3    is whether there is any reliable evidence in the record that could support the conclusion reached.

4    Id.

5              In recent years the Ninth Circuit Court of Appeals has been called upon to address

6    these issues in four significant cases, each of which will be discussed below.  First, in Biggs the

7    Ninth Circuit recognized that a continued reliance on an unchanging factor such as the

8    circumstances of the offense in denying parole could, at some point, result in a due process

9    violation.  334 F.3d at 916-17.  That holding has been acknowledged as representing the law of

10    the circuit.  Irons v. Carey, 505 F.3d 846, 853 (9th Cir. 2007); Sass, 461 F.3d at 1129; see also

11    Hayward, 512 F.3d at 545.  While the court in Biggs rejected several of the reasons given by the

12    Board for finding the petitioner unsuitable for parole, it upheld three:  (1) petitioner's

13    commitment offense involved the murder of a witness; (2) the murder was carried out in a

14    manner exhibiting a callous disregard for the life and suffering of another; and (3) petitioner

15    could benefit from therapy.  Biggs, 334 F.3d at 913.  However, the court cautioned that continued

16    reliance solely upon the gravity of the offense of conviction and petitioner's conduct prior to that

17    offense in denying parole could violate due process.  In this regard, the court observed:

18            As in the present instance, the parole board's sole supportable
                reliance on the gravity of the offense and conduct prior to

19            imprisonment to justify denial of parole can be initially justified as
                fulfilling the requirements set forth by state law.  Over time,

20            however, should Biggs continue to demonstrate exemplary
                behavior and evidence of rehabilitation, denying him a parole date

21            simply because of the nature of his offense would raise serious
                questions involving his liberty interest in parole.

22

23    Id. at 916.  The court also stated that "[a] continued reliance in the future on an unchanging

24    factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the

25    rehabilitative goals espoused by the prison system and could result in a due process violation."

26    Id. at 917.

In <u>Sass</u>, the Board had found the petitioner unsuitable for parole at his third

suitability hearing based on the gravity of his offenses of conviction in combination with his

prior offenses.  461 F.3d at 1126.  Relying on the decision in <u>Biggs</u>, the petitioner in <u>Sass</u>

contended that reliance on these unchanging factors violated his right to due process.  The court

disagreed, concluding that in the case before it these factors amounted to "some evidence" to

support the Board's determination.  <u>Id.</u> at 1129.  The court explained its holding as follows:

> While upholding an unsuitability determination based on these
> same factors, we previously acknowledged that "continued reliance
> in the future on an unchanging factor, the circumstance of the
> offense and conduct prior to imprisonment, runs contrary to the
> rehabilitative goals espoused by the prison system and could result
> in a due process violation."  <u>Biggs</u>, 334 F.3d at 917 (emphasis
> added).  Under AEDPA it is not our function to speculate about
> how future parole hearings could proceed.  <u>Cf.</u> <u>id.</u>  The evidence of
> Sass' prior offenses and the gravity of his convicted offenses
> constitute some evidence to support the Board's decision.
> Consequently, the state court decisions upholding the denials were
> neither contrary to, nor did they involve an unreasonable
> application of, clearly established Federal law as determined by the
> Supreme Court of the United States.  28 U.S.C. § 2254(d).

461 F.3d at 1129.

Subsequently, in <u>Irons</u> the Ninth Circuit sought to harmonize the holdings in

<u>Biggs</u> and <u>Sass</u>, stating as follows:

> Because the murder Sass committed was less callous and cruel than
> the one committed by Irons, and because Sass was likewise denied
> parole in spite of exemplary conduct in prison and evidence of
> rehabilitation, our decision in <u>Sass</u> precludes us from accepting
> Iron's due process argument or otherwise affirming the district
> court's grant of relief.
>
> We note that in all the cases in which we have held that a parole
> board's decision to deem a prisoner unsuitable for parole solely on
> the basis of his commitment offense comports with due process,
> the decision was made before the inmate had served the minimum
> number of years required by his sentence. Specifically, in <u>Biggs</u>,
> <u>Sass</u>, and here, the petitioners had not served the minimum number
> of years to which they had been sentenced at the time of the
> challenged parole denial by the Board. <u>Biggs</u>, 334 F.3d at 912;
> <u>Sass</u>, 461 F.3d 1125. All we held in those cases and all we hold
> today, therefore, is that, given the particular circumstances of the

1
2

    offenses in these cases, due process was not violated when these
prisoners were deemed unsuitable for parole prior to the expiration
of their minimum terms.

3
4
5
6
7
8

    Furthermore, we note that in <u>Sass</u> and in the case before us there
was substantial evidence in the record demonstrating rehabilitation.
In both cases, the California Board of Prison Terms appeared to
give little or no weight to this evidence in reaching its conclusion
that Sass and Irons presently constituted a danger to society and
thus were unsuitable for parole. We hope that the Board will come
to recognize that in some cases, indefinite detention based solely
on an inmate's commitment offense, regardless of the extent of his
rehabilitation, will at some point violate due process, given the
liberty interest in parole that flows from the relevant California
statutes. <u>Biggs</u>, 334 F.3d at 917.

9 <u>Irons</u>, 505 F.3d at 853-54.

10        Finally, and most recently, in <u>Hayward</u>, the Ninth Circuit determined that under

11 the circumstances of that case the unchanging factor of the gravity of the commitment offense did

12 not constitute "some evidence" supporting the governor's decision to reverse a parole grant on

13 the basis that the petitioner's release would pose a continuing danger to society.  <u>Hayward</u>, 512

14 F.3d at 546.  The circumstances relied upon by the court to reach this conclusion in <u>Hayward</u>

15 were the following: (1) the petitioner had served twenty-seven years in prison on a sentence of

16 fifteen years to life; (2) the petitioner was sixty-four years old; (3) after eleven parole suitability

17 hearings, the Board had twice recommended that the petitioner receive a parole date; (4) former

18 California Governor Gray Davis reversed the Board's second grant of parole based on seven

19 factors, four of which were unsupported by the record and three of which were based on

20 unchanging circumstances; (5) the provocation for petitioner's crime was the attempted rape of

21 his girlfriend (and future wife) by the victim; (6) the petitioner had solid parole plans, including

22 several offers of employment and a place to live; and (7) the petitioner had an "exemplary"

23 prison record for most of his period of incarceration, with his last major disciplinary violation

24 taking place in 1989 and with only a minor disciplinary infraction in 1997.  <u>Id.</u>  Against this

25 background the Ninth Circuit explained:

26 /////

> In light of the extraordinary circumstances of this case – given the provocation for Hayward's violent crime in 1978, his incarceration for almost thirty years with his positive prison record in recent times, and the favorable discretionary decisions of the Board in successive hearings, which were reversed by the Governor on factual premises most of which were not documented in the record – we conclude that the unchanging factor of the gravity of Hayward's commitment offense had no predictive value regarding his suitability for parole. In the circumstances of this case, the Governor violated Hayward's due process rights by relying on that stale and static factor in reversing his parole grant.

Hayward, 512 F.3d at 546.

After taking into consideration the Ninth Circuit decisions in Biggs, Sass, Irons, and Hayward, and for the reasons set forth below, this court concludes that petitioner is entitled to federal habeas relief with respect to his challenge to then-Governor Davis' reversal of the Board's 2002 decision granting him parole.

D. Discussion

After carefully reviewing the record, this court concludes that the San Joaquin County Superior Court unreasonably applied the "some evidence" standard when it determined that the Governor's reversal of the Board's grant of parole was justified. No evidence in the record before this court supports a conclusion that petitioner's release would unreasonably endanger public safety. In this regard, this case presents just as strong a case for relief as did the petitioner in Hayward.

Here, petitioner is now sixty-three (63) years old and has served far more than the minimum number of years required by his sentence.[6] He committed his crime of second-degree murder (the same offense as the petitioner in Hayward) decades ago under unusual circumstances and during a time of significant stress in his life according to the Board's 2002 findings. Specifically, after eight years of marriage petitioner's wife had separated from him five days

---

[6] As noted, petitioner was sentenced to a term of fifteen years to life. Petitioner entered CDCR on September 1, 1987. At the time of then-Governor Davis' reversal, he had served just over fifteen years in state prison. He has now been imprisoned for over twenty years.

prior to the shooting.  Immediately after his wife left him, petitioner turned to drugs and alcohol

in response to the pain of the separation and basically went without sleep for the four nights prior

to the murder.  On the day in question, petitioner saw his wife sitting in a parked truck with the

victim, who had previously been a house guest of he and his wife.  In his altered state of mind, it

seemed to petitioner that this was the root of the pain he was suffering, causing him to confront

the victim with a gun he kept in his car.  The confusing events that followed resulted in petitioner

shooting and killing the victim.  This confluence of circumstances are both unusual and

extremely unlikely to recur in the remaining years of petitioner's life.[7]  Petitioner has accepted

responsibility for his crime and has shown remorse for it.[8]  Petitioner has also demonstrated that

he can be released without presenting a probable danger to society as evidenced by his virtually

disciplinary-free prison record,[9] his above-average to exceptional work reports, his extensive

involvement in vocational programs, his record of constant employment with Prison Industries

since his imprisonment and his positive psychiatric evaluations.  Moreover, petitioner's pre-

offense background was very stable and included him earning both his GED and an Associate

---

[7]  Petitioner explained during the 2002 hearing: "the pain I was going through and because of the separation, you know, and it was emotionally hard for me, and it just came all out at that time.  He was there with her and it seemed to me that that was the root of the pain that I was suffering. . . . [I]t seemed like my life was turned upside down right at that moment, and it just seemed like that there was the root."  (Resp't's Opp'n to Pet'r's Mot. for Summ. J., Ex. B at 6-7.)

[8]  For example, during the 2002 parole hearing, the presiding parole commissioner asked petitioner with regard to his crime "You want to tell us about it, want to tell us why."  Petitioner responded "Very bad choice.  I just did some things that I shouldn't have done that day, and when I confronted him, it got out of hand.  I wish with all my heart that I could change that day, but I can't.  All I can say is I'm sorry.  Sorry doesn't do it though.  It's not just enough."  (Resp't's Opp'n to Pet'r's Mot. for Summ. J., Ex. B at 5-6.)  Petitioner further noted "I made some bad choices and I know I made some bad choices.  I could have done everything differently, and I wish I had of, but it's hindsight now and all I can say is that I'm sorry that it happened."  (Id. at 6.)

[9]  At the time of his 2002 parole hearing, petitioner had a classification score of zero, with but a single prison disciplinary violation for a work stoppage that took place back in 1994.  (Resp't's Opp'n to Pet'r's Mot. for Summ. J., Ex. B at 13-14.)  In this regard, petitioner is even more disciplinary-free while in prison than was the petitioner in the Hayward case.

Arts Degree from San Jose City College, active duty with the United States Navy with an honorable discharge, steady employment and a long-term relationship with one Etta Maitland. (Resp't's Opp'n to Pet'r's Mot. for Summ. J., Ex. B at 15-16, 45-51.)  Petitioner also has a stable post-offense background, including his ongoing seventeen-year relationship with Ms. Maitland, financial support from and future residence with Ms. Maitland, an extensive network of family and friends supporting him, marketable skills, and employment offers from Reno Rebar, Tahoe Schooners, and Len's Air Conditioning.  (Id. at 25-27.)[10]

          Then-Governor Davis based his reversal of the Board's decision on five factual findings that have no evidentiary support in the record or fail to demonstrate that petitioner would pose a danger to public safety if released from prison.  First, the former Governor referenced petitioner's 1976 arrest in Carson City, Nevada, for felony coercion, kidnapping, battery with a deadly weapon, and assault with intent to commit murder.  However, as the Governor recognized, "there is no official record" of any disposition of the arrest or charges brought nor is their a record of any conviction or sentence resulting from this dated incident. (Resp't's Opp'n to Pet'r's Mot. for Summ. J., Ex. C.)  Apparently the matter began as a dispute between petitioner and his then-wife in which a members of his wife's family became involved, resulting in his wife's uncle shooting at him and petitioner firing back as he fled.  (Resp't's Answer, Ex. C.)  Petitioner recalls that as a result of the incident, at most, he pled to a misdemeanor simple assault charge and received a six-month sentence that was stayed in its entirety.  Even if petitioner faced charges in connection with the matter, which again there is no record of, it occurred now more than thirty years ago.  Just as in Hayward, this type of dated misconduct prior to the petitioner's offense of conviction does not support the Governor's conclusion that petitioner poses a threat to public safety today.  As the Ninth Circuit has observed, "[i]t can hardly be doubted that time may attenuate the taint of certain prior

---

[10]  Petitioner is certified as a journeyman electrician and a stationary engineer.  (Resp't's Opp'n to Pet'r's Mot. for Summ. J., Ex. B at 14.)

misconduct."  <u>Hayward</u>, 512 F.3d at 545-46.  <u>See also</u> <u>Biggs</u>, 334 F.3d at 916 ("Over time,

however, should [petitioner] continue to demonstrate exemplary behavior and evidence of

rehabilitation, denying him a parole date simply because of the nature of [his] offense and prior

conduct would raise serious questions involving his liberty interest in parole."); <u>Sass</u>, 461 F.3d at

127-28 ("continued reliance in the future on an unchanging factor, the circumstance of the

offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by

the prison system and could result in a due process violation" (quoting  <u>Biggs</u>, 334 F.3d at 917)).

      Former Governor Davis also mentioned petitioner's admission to using drugs and

alcohol the day before committing his crime but his denial of having a substance abuse problem.

This suggested criticism is not supported by the record which instead suggests that petitioner

does not, in fact, have a chronic substance abuse problem.  Since as early as 1993, well before he

first became eligible for parole, petitioner's psychological reports consistently stated that

"substance abuse does not appear to be a problem for this inmate," and that any substance abuse

at the time of the commitment offense is "in sustained full remission."  (Resp't's Answer, Ex. C

(Psychological Reports dated Sept. 1, 1993, Sept. 1, 1995, Mar. 28, 1996, Apr. 21, 1998, Dec. 7,

2000)).  Indeed, petitioner's drug abuse at the time of his offense was described by one staff

psychologist as "situational and temporary" because there was no clear indication that he was

previously involved in drug abuse. (<u>Id.</u>, Psychological Report dated Aug. 13, 1993).  As noted

above, in the few days immediately before the commission of his crime, petitioner found himself

in circumstances involving significant emotional, mental and physical stress that are not likely to

recur.  Moreover, since his incarceration over twenty years ago, petitioner has not abused drugs

or alcohol even though, as prison officials acknowledge, opportunities certainly exist within

prison walls to engage in such activities.[11]  (Resp't's Answer, Ex. C.)  Finally, while

---

[11]  As one prison staff psychologist noted in 2003 "It appears to this clinician that Mr.
Sprinkle's risk to the community will remain low in comparison to most parolees or other
citizens given that he remain[s] free from alcohol or substance abuse."  (Resp't's Answer, Ex.
C.)

incarcerated, petitioner has completed an AA program and for nine years was involved in the

Straight Life Program in which he counseled troubled youth about drugs and life choices,

advocating complete abstinence from any drug or alcohol use.  (Id., Exs. B, C, & F.)

Next, the Governor found disconcerting petitioner's continued assertion that the

shooting of his victim was accidental, noting that petitioner had pleaded guilty to second-degree

murder and not to involuntary manslaughter.  The Governor also observed that in petitioner's last

psychological evaluation in 2000, the evaluators noted that "there is an element of denial and

rationalization" in Mr. Sprinkle's life.  Former Governor Davis viewed this "element of denial

and rationalization" as an indication that petitioner may still pose a risk to public safety and as a

failure to accept responsibility for his actions.   (Resp't's Opp'n to Pet'r's Mot. for Summ. J., Ex.

C.)  However, the Governor's reliance on this isolated comment by the evaluators in reaching his

conclusion was not well-supported.  In the referenced report, the same evaluators expressly

addressed petitioner's potential dangerousness, stating "As far as assessment of dangerousness in

the community is concerned, in a state of sobriety, the Subject's violence potential is average for

the general male population." (Resp't's Answer, Ex. C (Psychosocial Assessment dated Dec. 7,

2000).)  Thus, even in light of the possible "element of denial and rationalization" in petitioner's

life, the evaluators found his potential for violence average for the general male population.  (Id.)

Even more importantly, in an addendum to this same report, the Chief Psychologist at Deuel

Vocational Institution concluded as follows:  "I find nothing prohibitive of the favorable

consideration of parole since the Report to the Board of Prison Terms cited above."  (Id.,

Addendum dated Jan. 29, 2002.)

To the extent that the former Governor believed petitioner had failed to accept

responsibility for his actions, as noted above, there is no evidence in the record to support such a

conclusion.  Rather, the record demonstrates that petitioner understands both the nature and

/////

/////

1    magnitude of his crime.  Petitioner has repeatedly and genuinely accepted responsibility for his

2    offense conduct and has demonstrated remorse for the loss of life that resulted from it.[12]

3            The former Governor also expressed concern regarding petitioner's ability to

4    control his anger given the impulsive nature of his offense of conviction.  The Governor cited an

5    instance in 1997 in which petitioner allegedly confronted a guest at the prison's Straight Life

6    Program.  Apparently, petitioner wanted to speak with one of the young men in attendance and

7    held his arm to do so at which point a program supervisor told petitioner, "You can't touch the

8    kid." (Resp't's Answer, Ex. C.)  Based on the incident, petitioner was temporarily suspended

9    from participation in the program but was later reinstated.  (Id.)  As noted above, prison

10   psychological reports reflect that petitioner was involved in the Straight Life Program for nine

11   years.  (Id.)  He has held the positions of executive secretary and under-secretary and had

12   significant and time-consuming duties with respect to the operation of that program.  (Id.)  For

13   example, he helped counsel troubled youths about drugs, gang activity and life choices on

14   Saturdays and Mondays and participated in staff meetings on Tuesdays.  (Resp't's Answer, Ex.

15   C.)  In addition, petitioner has received certificates of appreciation for his participation in that

16   program.  (Resp't's Opp'n to Pet'r's Mot. for Summ. J., Ex. D at 23-24.)  That prison officials

17   reversed petitioner's suspension and allowed him to continue counseling young people

18   demonstrates that he does not have an anger-management problem and would not pose an

19   unreasonable risk of danger to the public if released.  Finally, it is worth again emphasizing that

20   petitioner has been essentially disciplinary-free throughout his twenty-plus year tenure in prison,

21   and has virtually no pre-offense record of violence or anger management problems.

22   /////

23

24        [12]  Under Section 5011 of the California Penal Code, "The Board of Prison Terms shall
     not require, when setting parole dates, an admission of guilt to any crime for which an inmate
     committed." Cal. Penal Code § 5011.  Seemingly, the Governor also should not require such an
25   admission of guilt before accepting a Board's decision to set a parole date.  See e.g., Hayward,
     512 F.3d at 542 ("Under California law, the Governor, in considering whether to reverse a grant
26   of parole by the Board, must consider the same factors the Board is required to consider.")

1    Finally, the former Governor found that petitioner demonstrated a wanton

2 disregard for human suffering and caused great bodily injury when he confronted his victim with

3 a loaded, cocked firearm in the presence of his estranged wife.  (Resp't's Opp'n to Pet'r's Mot.

4 for Summ. J., Ex. C.)[13]  Similar to the conclusion reached by the Ninth Circuit in Hayward,

5 however, this court rejects the Governor's reliance on the gravity of petitioner's commitment

6 offense to deny parole on this record.  Given petitioner's rehabilitation, nearly impeccable

7 conduct while in prison, and the Board's decision to release him on parole, the court finds that

8 his commitment offense, which occurred now twenty-two years ago, does not demonstrate that

9 his release will pose an imminent danger to public safety.  Moreover, the court finds that under

10 the circumstance presented by this case the former Governor's reliance on this "stale and static

11 factor" to reverse the grant of parole violates petitioner's due process rights.  See Hayward, 512

12 F.3d at 546-47; cf. Irons, 505 F.3d at 846 ("due process was not violated when these prisoners

13 were deemed unsuitable for parole prior to the expiration of their minimum terms").

14    Under these circumstances, the court finds that the former Governor's reversal of

15 the Board's grant of parole denied petitioner due process.  Accordingly, the court concludes that

16 petitioner's motion for partial summary judgment with respect to the former Governor's decision

17 should be granted.

18 III.  Petitioner's 2003 Denial of Parole

19    A.  Board's Decision

20    After then-Governor Davis' reversal of the Board's 2002 decision granting parole,

21 in 2003 the Board denied petitioner parole following a hearing.  (Resp't's Opp'n to Pet'r's Mot.

22 for Summ. J., Ex. D.)  The Board explained the rationale for its decision as follows:

23

24    [13] In reversing the Board's grant of parole former Governor Davis also cited the opposition to petitioner's release expressed in a letter by the Lassen County District Attorney's

25 Office.  However, "the district attorney's opinion, without more, cannot be considered 'some evidence' under Hill that supports the Governor's reversal of parole."  Hayward, 512 F.3d at 545

26 n. 9.

1    The Panel reviewed all the information received from the
2    public and relied on the following circumstances in concluding that
     the prisoner is not suitable for parole and would pose an
     unreasonable risk of danger to others or a threat to public safety.
3    The offense was carried out in a rather uncaring and unfeeling
     manner.  The offense was carried out in a manner that shows a total
4    disregard for another human being and the motive for the crime
     was inexplicable or very trivial in relationship to the offense.
5    These conclusions are drawn from the State of Facts wherein on
     12-16-1986 the Lassen County Sheriff's Department received a call
6    of a possible deceased body in a vehicle.  They responded and they
     discovered the (inaudible) of the victim.  The prisoner did not have
7    much of a criminal history.  However, he did have a previous
     history of violent kinds of behavior in which there's not much
8    information on, but it involved what was allegedly a kidnap,
     battery and assault with a deadly weapon.  Under unstable social
9    history, there's no indication that the prisoner had an unstable
     social history.  Under institutional program, the prisoner has
10   programmed.  A recent psychiatric report by Dr. Mary Young is a
     positive report.  It shows that the prisoner's level of dangerousness
11   in the community is greatly reduced and also his level of
     dangerousness in prison is also reduced.  The prisoner have [sic]
12   excellent parole plans to include residential and employment.  The
     Hearing Panel notes that there was no notice – there was no
13   opposition noted.  The Panel makes the following findings:  The
     prisoner needs to continue his positive program and also involve
14   himself in self-help programs, the kinds of self-help programs that
     would help him deal with anger, and substance abuse related
15   programs.  Until enough progress is made in that area the prisoner
     continues to – well (inaudible) enable the prisoner to face, discuss,
16   understand and cope with stress in a nondestructive manner.  Until
     enough progress is (inaudible) necessary the prisoner continues to
17   be unpredictable and a threat to others.  Nevertheless, the prisoner
     should be commended for his good behavior.  He should be
18   commended for the skills that he's achieved and also for the
     excellent support – community support that he have [sic], to
19   include the support of a former ambassador.  However, those
     positive aspects of his behavior does [sic] not outweigh the factors
20   for unsuitability.  Parole is going to be denied for one year.  The
     Panel recommend [sic] that you remain disciplinary-free and that
21   you continue (inaudible) that you start to participate in self-help
     programs.
22

23   (Resp't's Opp'n to Pet'r's Mot. for Summ. J., Ex. D at 66-68.)

24          B.  Discussion

25          The court finds that the Board's 2003 decision denying parole is also unsupported

26   by any evidence.  Parroting the Governor's reversal, the Board in 2003 merely cited petitioner's

28

commitment offense, the 1976 incident in Carson City, substance abuse, anger management and lack of self-help as the reasons for denying parole. As the Ninth Circuit maintained in <u>Hayward</u>, "California courts have made clear that the 'findings that are necessary to deem a prisoner unsuitable for parole are not that a particular factor or factors indicating unsuitability exist, but that a prisoner's release will unreasonably endanger public safety." 512 F.3d at 543. For the reasons discussed above with respect to the Governor's 2002 reversal of the grant of parole, the court finds that the Board's 2003 decision has no evidentiary support and that the factors cited therein fail to demonstrate that petitioner's release would pose a danger to public safety.

Under these circumstances, the court finds that the Board's 2003 denial of parole violated petitioner's right to due process. Accordingly, petitioner's motion for partial summary judgment with respect to the Board's denial of parole in 2003 should be granted.

IV.  <u>Petitioner's 2004 Denial of Parole</u>

A.  <u>Board's Decision</u>

In 2004, the Board again denied petitioner's parole. (Resp't's Opp'n to Pet'r's Mot. for Summ. J., Ex. E.) The Board explained the rationale of its decision at that time as follows:

> Sir, we have reviewed all of the information that we received from the public and anything else that's been available today (indiscernible) and we relied on the following circumstances in concluding that you, the prisoner, are not still suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The offense was carried out in an especially cruel and callous manner. There were multiple victims involved in that same incident. The motive was inexplicable or very trivial in relation to the offense. And these conclusions are drawn from the facts – from the State of Facts that we've reviewed today wherein the prisoner was drinking and abusing drugs prior to the (indiscernible) with (indiscernible). The inmate as he was passing by saw a car, where he found the victim and his wife. He was very angry and his life was falling apart. He had a loaded firearm, which he pointed at the victim. And he told us today that he shot the victim in the head, and the wife was in the car at that moment. He then drove away with his estranged wife, and at some point after driving away, he struck her in the face and did injure her. The prisoner has on previous occasions, inflicted or

29

attempted to inflict serious injury on a victim.  He has – I'm going
to conclude that he has a record for violence from his own
statement that he has a misdemeanor conviction.  He has a history
of unstable or tumultuous relationships with others.  And that
relates to the Carson City altercation that he had apparently with a
girlfriend, her father, and an uncle.  And with respect to the uncle,
there's evidence, and that I believe he has testified in the past that
he shot that uncle.  There's an unstable social history and prior
criminality, which includes the incident of July 10, 1976, involving
similar acts of violence, including the use of a firearm in a case
which resulted in at least a misdemeanor conviction arising from a
criminal investigation of a felony coercion, kidnapping, battery
(indiscernible).  As I've already indicated, there was a conflict
involving his girlfriend.  He struck her father and fired a gun at the
uncle.  I have to tell you, Mr. Sprinkle, that I had a (indiscernible)
time with your case today.

(Resp't's Opp'n to Pet'r's Mot. for Summ. J., Ex. E.)

B. Discussion

The court also finds that the Board's 2004 decision to deny parole to be

unsupported by any evidence.  In that decision the Board relied exclusively on unchangeable and

dated factors, specifically, petitioner's offense of commitment, the manner in which it was

carried out, and a single incident that occurred prior to his offense.  Petitioner "cannot change the

past" and denying him parole based solely on these immutable facts "effectively changes his

sentence" from fifteen years to life "into life imprisonment without the possibility of parole."

Martin v. Marshall, 431 F. Supp. 2d 1038, 1046 (N.D. Cal. 2006).  The Board's 2004 decision

relied solely on "stale and static factor[s]" in violation of petitioner's due process rights and the

factors cited therein fail to demonstrate that petitioner would pose a danger to public safety if

released from prison.  See Hayward, 512 F.3d at 546-47.

Under these circumstances, the court finds that the Board's 2004 denial of parole

resulted in a violation of petitioner's right to due process.  Petitioner's motion for partial

summary judgment with respect to his 2004 denial of parole should be granted.

/////

/////

30

**CONCLUSION**

In sum, in light of the extraordinary facts of this case, including the unusual circumstances of petitioner's crime, his exemplary record of conduct in prison, his participation in self-help programs including AA, Straight Life Program, NA, and Creative Conflict Resolutions,[14] his viable parole plans, and the favorable Board decision in 2002 granting him parole, the court concludes that, under binding precedent, the challenged parole denials have violated  petitioner's due process rights.  The Governor's 2002 reversal and the Board's 2003 and 2004 denials are not supported by "some evidence" as constitutionally required.  Accordingly, the court will recommend that petitioner's motion for partial summary judgment be granted, that his application for writ of habeas corpus be granted and that petitioner be released on parole.

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1.  Petitioner's March 15, 2007 motion for partial summary judgment be granted; and

2.  Petitioner application for writ of habeas be granted and respondent be directed to release petitioner on parole within thirty (30) days of the date of entry of judgment.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fifteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are

/////

/////

/////

---

[14]  Petitioner was enrolled in both NA and Creative Conflict Resolutions at the time of his 2004 parole hearing.  (Resp't's Opp'n to Pet'r's Mot. for Summ. J., Ex. E at 36-37, 60.)

1  advised that failure to file objections within the specified time may waive the right to appeal the

2  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3  DATED: February 28, 2008.

4

5  _____

6  DALE A. DROZD
   UNITED STATES MAGISTRATE JUDGE

7  DAD:9
   spri1783.157

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26